| **Summons** | CIVIL DOCKET NO.<br>32770/00064 | **Trial Court of Massachusetts**<br>**The Superior Court** |
|---|---|---|

| CASE NAME:<br>Lisa Mackey-Fuentes<br><br>Plaintiff(s)<br><br>Shaw's Supermarkets, Inc., et al.<br><br>Defendant(s) | Thomas H. Driscoll, Jr.　Clerk of Courts<br>Essex　County<br>COURT NAME & ADDRESS:<br>Essex County Superior, Newburyport<br>145 High Street<br>Newburyport, MA 01950 |
|---|---|

THIS SUMMONS IS DIRECTED TO ___Shaw's Supermarkets, Inc.___ (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the _____ Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.**

To respond to this lawsuit, you must file a written to response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

   a) Filing your **signed original** response with the Clerk's Office for Civil Business, Essex Superior Court 145 High Street, Newburyport, MA 01950 (address), by mail or in person **AND**

   b) Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address: Whitney Law Group, LLC, 11 State St., Marblehead, MA 01945

3. **What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your court no more than 10 days after sending your Answer.

3 (cont). You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12**. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at:

www.mass.gov/courts/case-legal-res/rules_of_court

### 4. Legal Assistance.

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

### 5. Required Information on All Filings:

The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Heidi E. Brieger , Chief Justice on , 20 . (Seal)

Clerk-Magistrate Thomas H. Driscoll, Jr.

**Note:** The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

---

PROOF OF SERVICE OF PROCESS

---

I hereby certify that on _____ . I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

_____

_____

_____

Dated: _____

Signature: _____

### N.B.   TO PROCESS SERVER:

**PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.**

Date:

| **Summons** | CIVIL DOCKET NO.<br>22 77CV00064 | **Trial Court of Massachusetts**<br>**The Superior Court** |
|---|---|---|

CASE NAME:

Lisa Mackey-Fuentes

Plaintiff(s)

vs.

Show's Supermarkets Inc., et al.

Defendant(s)

Thomas H. Driscoll, Jr.          Clerk of Courts

Essex          County

COURT NAME & ADDRESS:

Essex County Superior Court Newburyport
145 High Street.
Newburyport, MA 01950

---

THIS SUMMONS IS DIRECTED TO **James Hall**_____ (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the _____ Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.**

To respond to this lawsuit, you must file a written to response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

   a) Filing your **signed original** response with the Clerk's Office for Civil Business, Essex County Superior Court
145 High Street, Newburyport, MA 01950 (address), by mail or in person **AND**

   b) Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address: Whitney Law Group, LLC, 11 State Street, Marblehead, MA 01945

3. **What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your court no more than 10 days after sending your Answer.

3 (cont). You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12**. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at:

www.mass.gov/courts/case-legal-res/rules_of_court

### 4. Legal Assistance.

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

### 5. Required Information on All Filings:

The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Heidi E. Brieger , Chief Justice on _____ , 20____ . (Seal)

Clerk-Magistrate Thomas H. Driscoll, Jr.

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

---

### PROOF OF SERVICE OF PROCESS

---

I hereby certify that on _____ . I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

_____

_____

_____

Dated: _____          Signature: _____

**N.B.   TO PROCESS SERVER:**

**PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.**

Date:

| **Summons** | CIVIL DOCKET NO. 2277CV00064 | **Trial Court of Massachusetts** **The Superior Court** |
|---|---|---|

CASE NAME:
Lisa Mackey-Fuentes

Plaintiff(s)

vs.

Shaw's Supermarkets, Inc., et al.

Defendant(s)

Thomas H. Driscoll, Jr.          Clerk of Courts

Essex          County

COURT NAME & ADDRESS:
Essex County Superior Court - Newburyport
145 High Street
Newburyport, MA 01950

THIS SUMMONS IS DIRECTED TO **Kirby Shirk** _____ (Defendant's name)

You are being sued. The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed
against you is attached to this summons and the original complaint has been filed in the                              Court.
**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.**
If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint.
You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to
resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing
from the Court.**

2. **How to Respond.**
To respond to this lawsuit, you must file a written to response with the court **and** mail a copy to the Plaintiff's Attorney (or the
Plaintiff, if unrepresented). You can do this by:
        a) Filing your **signed original** response with the Clerk's Office for Civil Business, Essex County Superior Court
145 High Street, Newburyport, MA 01950 (address), by mail or in person **AND**
        b) Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address:
Whitney Law Group, LLC, 11 State Street, Marblehead, MA 01945

3. **What to Include in Your Response.**
An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s)
alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or
you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that
are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer.
Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case
        heard by a jury, you must **specifically** request a jury trial in your court no more than 10 days after sending your Answer.

3 (cont). You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12**. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at:

www.mass.gov/courts/case-legal-res/rules_of_court

### 4. Legal Assistance.

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

### 5. Required Information on All Filings:

The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Heidi E. Brieger _____ , Chief Justice on _____ , 20___ . (Seal)

Clerk-Magistrate Thomas H. Driscoll, Jr. _____

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

---

## PROOF OF SERVICE OF PROCESS

I hereby certify that on _____ . I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

_____

_____

_____

Dated: _____          Signature: _____

**N.B.   TO PROCESS SERVER:**

**PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.**

Date:

| **Summons** | CIVIL DOCKET NO. 2277CV0006 | **Trial Court of Massachusetts** **The Superior Court** |
|---|---|---|

CASE NAME: Lisa Mackey Fuentes

Plaintiff(s)

vs.

Shaw's Supermarket, Inc., et al.

Defendant(s)

Thomas H. Driscoll, Jr.     Clerk of Courts

Essex     County

COURT NAME & ADDRESS:
Essex County Superior Court - Newburyport
145 High Street
Newburyport, MA 01950

THIS SUMMONS IS DIRECTED TO Jennifer Johnson _____ (Defendant's name)

**You are being sued.** The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the     Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. **You must respond to this lawsuit in writing within 20 days.**

If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.**

To respond to this lawsuit, you must file a written to response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

a) Filing your **signed original** response with the Clerk's Office for Civil Business, Essex Superior     Court 145 High Street, Newburyport, MA 01950     (address), by mail or in person **AND**

b) Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address: Whitney Law Group, LLC, 11 State St., Marblehead, MA 01945

3. **What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your court no more than 10 days after sending your Answer.

3 (cont). You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12**. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at:

www.mass.gov/courts/case-legal-res/rules_of_court

**4. Legal Assistance.**

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

**5. Required Information on All Filings:**

The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Heidi E. Brieger _____ , Chief Justice on _____ , 20 ____ . (Seal)

Clerk-Magistrate Thomas H. Driscoll, Jr. _____

**Note:** The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

---

### PROOF OF SERVICE OF PROCESS

I hereby certify that on _____ . I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

_____

_____

_____

Dated: _____     Signature: _____

**N.B.   TO PROCESS SERVER:**

**PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.**

Date: _____

| **Summons** | CIVIL DOCKET NO. | **Trial Court of Massachusetts** |
| --- | --- | --- |
| | 2277CV00064 | **The Superior Court** |

CASE NAME: Lisa Mackey-Fuentes

Plaintiff(s)

Shaw's Supermarkets, Inc., et al.

vs.

Defendant(s)

Thomas H. Driscoll, Jr.          Clerk of Courts

Essex          County

COURT NAME & ADDRESS:

Essex County Superior Court -Newburyport
145 High Street
Newburyport, MA 01950

THIS SUMMONS IS DIRECTED TO  Raup Ward          (Defendant's name)

<u>You are being sued.</u> The Plaintiff(s) named above has started a lawsuit against you. A copy of the Plaintiff's Complaint filed against you is attached to this summons and the original complaint has been filed in the          Court.

**YOU MUST ACT PROMPTLY TO PROTECT YOUR RIGHTS.**

1. <u>You must respond to this lawsuit in writing within 20 days.</u>

If you do not respond, the court may decide the case against you and award the Plaintiff everything asked for in the complaint. You will also lose the opportunity to tell your side of the story. You must respond to this lawsuit in writing even if you expect to resolve this matter with the Plaintiff. **If you need more time to respond, you may request an extension of time in writing from the Court.**

2. **How to Respond.**

To respond to this lawsuit, you must file a written to response with the court **and** mail a copy to the Plaintiff's Attorney (or the Plaintiff, if unrepresented). You can do this by:

 a) Filing your **signed original** response with the Clerk's Office for Civil Business, Essex Superior          Court
 145 High Street, Newburyport MA 01950 (address), by mail or in person **AND**

 b) Delivering or mailing a **copy** of your response to the Plaintiff's Attorney/Plaintiff at the following address:
 Whitney Law Group, LLC, 11 State Street, Marblehead, MA 01945

3. **What to Include in Your Response.**

An "Answer" is one type of response to a Complaint. Your Answer must state whether you agree or disagree with the fact(s) alleged in each paragraph of the Complaint. Some defenses, called affirmative defenses, must be stated in your Answer or you may lose your right to use them in court. If you have any claims against the Plaintiff (referred to as **counterclaims**) that are based on the same facts or transaction described in the Complaint, then you must include those claims in your Answer. Otherwise, you may lose your right to sue the Plaintiff about anything related to this lawsuit. If you want to have your case heard by a jury, you must **specifically** request a jury trial in your court no more than 10 days after sending your Answer.

3 (cont). You can also respond to a Complaint by filing a **"Motion to Dismiss,"** if you believe that the complaint is legally invalid or legally insufficient. A Motion to Dismiss must be based on one of the legal deficiencies or reasons listed under **Mass. R. Civ. P. 12**. If you are filing a Motion to Dismiss, you must also comply with the filing procedures for "Civil Motions" described in the rules of the Court in which the complaint was filed, available at:

www.mass.gov/courts/case-legal-res/rules_of_court

### 4. Legal Assistance.

You may wish to get legal help from a lawyer. If you cannot get legal help, some basic information for people who represent themselves is available at www.mass.gov/courts/selfhelp.

### 5. Required Information on All Filings:

The "civil docket number" appearing at the top of this notice is the case number assigned to this case and must appear on the front of your Answer or Motion to Dismiss. You should refer to yourself as the "Defendant."

Witness Hon. Heidi E. Brieger_____ , Chief Justice on _____ , 20____ . (Seal)

Clerk-Magistrate Thomas H. Driscoll, Jr.____

Note: The number assigned to the Complaint by the Clerk-Magistrate at the beginning of the lawsuit should be indicated on the summons before it is served on the Defendant.

---

### PROOF OF SERVICE OF PROCESS

I hereby certify that on _____ . I served a copy of this summons, together with a copy of the complaint in this action, on the defendant named in this summons, in the following manner (See Mass. R. Civ. P. 4(d)(1-5)):

_____

_____

_____

Dated: _____                                    Signature: _____

### N.B.  TO PROCESS SERVER:

PLEASE ENTER THE DATE THAT YOU MADE SERVICE ON THE DEFENDANT IN THIS BOX - BOTH ON THE ORIGINAL SUMMONS AND ON THE COPY OF THE SUMMONS SERVED ON THE DEFENDANT.

Date:

| **CIVIL ACTION COVER SHEET** | DOCKET NUMBER | **Trial Court of Massachusetts**<br>**The Superior Court** |
|---|---|---|

| PLAINTIFF(S): | Lisa Mackey-Fuentes | COUNTY |
|---|---|---|
| ADDRESS: | 295 Pawtucket Blvd, Unit 6, Lowell, MA 01854 | Essex |

| | | DEFENDANT(S): Shaw's Supermarkets, Inc., Raye Ward, Jennifer Johnson, Kirby Shirk, and Jen |

| ATTORNEY: | Mark M. Whitney, Esq. and Maureen T. DeSimone, Esq. | |
|---|---|---|
| ADDRESS: | Whitney Law Group, LLC | ADDRESS: 750 W. Center St., West Bridgewater, MA 02379 (Shaw's); |
| 11 State Street, Marblehead, MA 01945 | | 38 Colt Lane, Epping, NH 03042 (Ward); 268 Main St., #341, North Reading, MA 01864 (Johnson); |
| | | 24 Barker Road, Stratham, NH 03885 (Shirk); 807 Summer St., Manchester, MA 02944 (Hall) |
| BBO: | Whitney (BBO # 637054); DeSimone (BBO # 703358) | |

**TYPE OF ACTION AND TRACK DESIGNATION (see reverse side)**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B22 | Employment Discrimination | F | [X] YES   [ ] NO |

**\*If "Other" please describe:**

Is there a claim under G.L. c. 93A?   [ ] YES   [X] NO          Is this a class action under Mass. R. Civ. P. 23?   [ ] YES   [X] NO

**STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A**

The following is a full, itemized and detailed statement of the facts on which the undersigned plaintiff or plaintiff's counsel relies to determine money damages. For this form, disregard double or treble damage claims; indicate single damages only.

**TORT CLAIMS**
(attach additional sheets as necessary)

A. Documented medical expenses to date:
    1. Total hospital expenses ............................................................................................ $_____
    2. Total doctor expenses ............................................................................................ $_____
    3. Total chiropractic expenses .................................................................................... $_____
    4. Total physical therapy expenses ............................................................................ $_____
    5. Total other expenses (describe below) ................................................................... $_____
    Subtotal (A): $_____
B. Documented lost wages and compensation to date ...................................................... $>50,000
C. Documented property damages to date ........................................................................ $_____
D. Reasonably anticipated future medical and hospital expenses ..................................... $_____
E. Reasonably anticipated lost wages .............................................................................. $_____
F. Other documented items of damages (describe below) ................................................. $_____

G. Briefly describe plaintiff's injury, including the nature and extent of injury:
disability and gender discrimination, sexual harassment/hostile work environment & retaliation in violation of M.G.L. c. 151B          **TOTAL (A-F):**$>50,000
§§ 4 (1), 4(16) and 4(4); 42 U.S.C. § 2000e et seq., 29 U.S.C. § 2601 et seq.; FMLA (interference and retaliation); ADA

**CONTRACT CLAIMS**
(attach additional sheets as necessary)
[ ] This action includes a claim involving collection of a debt incurred pursuant to a revolving credit agreement. Mass. R. Civ. P. 8.1(a).
Provide a detailed description of claim(s):
**TOTAL:** $_____

**Signature of Attorney/ Unrepresented Plaintiff: X**          Date:

**RELATED ACTIONS:** Please provide the case number, case name, and county of any related actions pending in the Superior Court.

**CERTIFICATION PURSUANT TO SJC RULE 1:18**
I hereby certify that I have complied with requirements of Rule 5 of the Supreme Judicial Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods of dispute resolution.

**Signature of Attorney of Record:  X**          Date: **January 23, 2022**

# CIVIL ACTION COVER SHEET INSTRUCTIONS
## SELECT CATEGORY THAT BEST DESCRIBES YOUR CASE

### AC Actions Involving the State/Municipality *

| | |
|---|---|
| AA1 Contract Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AB1 Tortious Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AC1 Real Property Action involving Commonwealth, Municipality, MBTA etc. | (A) |
| AD1 Equity Action involving Commonwealth, Municipality, MBTA, etc. | (A) |
| AE1 Administrative Action involving Commonwealth, Municipality, MBTA,etc. | (A) |

### CN Contract/Business Cases

| | |
|---|---|
| A01 Services, Labor, and Materials | (F) |
| A02 Goods Sold and Delivered | (F) |
| A03 Commercial Paper | (F) |
| A04 Employment Contract | (F) |
| A05 Consumer Revolving Credit - M.R.C.P. 8.1 | (F) |
| A06 Insurance Contract | (F) |
| A08 Sale or Lease of Real Estate | (F) |
| A12 Construction Dispute | (A) |
| A14 Interpleader | (F) |
| BA1 Governance, Conduct, Internal Affairs of Entities | (A) |
| BA3 Liability of Shareholders, Directors, Officers, Partners, etc. | (A) |
| BB1 Shareholder Derivative | (A) |
| BB2 Securities Transactions | (A) |
| BC1 Mergers, Consolidations, Sales of Assets, Issuance of Debt, Equity, etc. | (A) |
| BD1 Intellectual Property | (A) |
| BD2 Proprietary Information or Trade Secrets | (A) |
| BG1 Financial Institutions/Funds | (A) |
| BH1 Violation of Antitrust or Trade Regulation Laws | (A) |
| A99 Other Contract/Business Action - Specify | (F) |

\* Choose this case type if ANY party is the Commonwealth, a municipality, the MBTA, or any other governmental entity UNLESS your case is a case type listed under Administrative Civil Actions (AA).

† Choose this case type if ANY party is an incarcerated party, UNLESS your case is a case type listed under Administrative Civil Actions (AA) or is a Prisoner Habeas Corpus case (E97).

### ER Equitable Remedies

| | |
|---|---|
| D01 Specific Performance of a Contract | (A) |
| D02 Reach and Apply | (F) |
| D03 Injunction | (F) |
| D04 Reform/ Cancel Instrument | (F) |
| D05 Equitable Replevin | (F) |
| D06 Contribution or Indemnification | (F) |
| D07 Imposition of a Trust | (A) |
| D08 Minority Shareholder's Suit | (A) |
| D09 Interference in Contractual Relationship | (F) |
| D10 Accounting | (A) |
| D11 Enforcement of Restrictive Covenant | (F) |
| D12 Dissolution of a Partnership | (F) |
| D13 Declaratory Judgment, G.L. c. 231A | (F) |
| D14 Dissolution of a Corporation | (F) |
| D99 Other Equity Action | (F) |

### PA Civil Actions Involving Incarcerated Party †

| | |
|---|---|
| PA1 Contract Action involving an Incarcerated Party | (A) |
| PB1 Tortious Action involving an Incarcerated Party | (A) |
| PC1 Real Property Action involving an Incarcerated Party | (F) |
| PD1 Equity Action involving an Incarcerated Party | (F) |
| PE1 Administrative Action involving an Incarcerated Party | (F) |

### TR Torts

| | |
|---|---|
| B03 Motor Vehicle Negligence - Personal Injury/Property Damage | (F) |
| B04 Other Negligence - Personal Injury/Property Damage | (F) |
| B05 Products Liability | (A) |
| B06 Malpractice - Medical | (A) |
| B07 Malpractice - Other | (A) |
| B08 Wrongful Death - Non-medical | (A) |
| B15 Defamation | (A) |
| B19 Asbestos | (A) |
| B20 Personal Injury - Slip & Fall | (F) |
| B21 Environmental | (F) |
| B22 Employment Discrimination | (F) |
| BE1 Fraud, Business Torts, etc. | (A) |
| B99 Other Tortious Action | (F) |

### RP Summary Process (Real Property)

| | |
|---|---|
| S01 Summary Process - Residential | (X) |
| S02 Summary Process - Commercial/ Non-residential | (F) |

### RP Real Property

| | |
|---|---|
| C01 Land Taking | (F) |
| C02 Zoning Appeal, G.L. c. 40A | (F) |
| C03 Dispute Concerning Title | (F) |
| C04 Foreclosure of a Mortgage | (X) |
| C05 Condominium Lien & Charges | (X) |
| C99 Other Real Property Action | (F) |

### MC Miscellaneous Civil Actions

| | |
|---|---|
| E18 Foreign Discovery Proceeding | (X) |
| E97 Prisoner Habeas Corpus | (X) |
| E22 Lottery Assignment, G.L. c. 10, § 28 | (X) |

### AB Abuse/Harassment Prevention

| | |
|---|---|
| E15 Abuse Prevention Petition, G.L. c. 209A | (X) |
| E21 Protection from Harassment, G.L. c. 258E(X) | |

### AA Administrative Civil Actions

| | |
|---|---|
| E02 Appeal from Administrative Agency, G.L. c. 30A | (X) |
| E03 Certiorari Action, G.L. c. 249, § 4 | (X) |
| E05 Confirmation of Arbitration Awards | (X) |
| E06 Mass Antitrust Act, G.L. c. 93, § 9 | (A) |
| E07 Mass Antitrust Act, G.L. c. 93, § 8 | (X) |
| E08 Appointment of a Receiver | (X) |
| E09 Construction Surety Bond, G.L. c. 149, §§ 29, 29A | (A) |
| E10 Summary Process Appeal | (X) |
| E11 Worker's Compensation | (X) |
| E16 Auto Surcharge Appeal | (X) |
| E17 Civil Rights Act, G.L. c.12, § 11H | (A) |
| E24 Appeal from District Court Commitment, G.L. c.123, § 9(b) | (X) |
| E25 Pleural Registry (Asbestos cases) | |
| E94 Forfeiture, G.L. c. 265, § 56 | (X) |
| E95 Forfeiture, G.L. c. 94C, § 47 | (F) |
| E99 Other Administrative Action | (X) |
| Z01 Medical Malpractice - Tribunal only, G.L. c. 231, § 60B | (F) |
| Z02 Appeal Bond Denial | (X) |

### SO Sex Offender Review

| | |
|---|---|
| E12 SDP Commitment, G.L. c. 123A, § 12 | (X) |
| E14 SDP Petition, G.L. c. 123A, § 9(b) | (X) |

### RC Restricted Civil Actions

| | |
|---|---|
| E19 Sex Offender Registry, G.L. c. 6, § 178M | (X) |
| E27 Minor Seeking Consent, G.L. c.112, § 12S(X) | |

### TRANSFER YOUR SELECTION TO THE FACE SHEET

**EXAMPLE:**

| CODE NO. | TYPE OF ACTION (specify) | TRACK | HAS A JURY CLAIM BEEN MADE? |
|---|---|---|---|
| B03 | Motor Vehicle Negligence-Personal Injury | F | ☒ YES   ☐ NO |

## STATEMENT OF DAMAGES PURSUANT TO G.L. c. 212, § 3A

**DUTY OF THE PLAINTIFF -** The plaintiff shall set forth, on the face of the civil action cover sheet (or attach additional sheets as necessary), a statement specifying the facts on which the plaintiff relies to determine money damages. A copy of such civil action cover sheet, including the statement as to the damages, shall be served with the complaint. **A clerk-magistrate shall not accept for filing a complaint, except as otherwise provided by law, unless it is accompanied by such a statement signed by the attorney or self-represented litigant.**

**DUTY OF THE DEFENDANT -** If the defendant believes that the statement of damages filed by the plaintiff is inadequate, the defendant may file with his/her answer a statement specifying the potential damages which may result if the plaintiff prevails.

## A CIVIL COVER SHEET MUST BE FILED WITH EACH COMPLAINT.
## FAILURE TO COMPLETE THIS COVER SHEET THOROUGHLY AND ACCURATELY
## MAY RESULT IN DISMISSAL OF THIS ACTION.

# COMMONWEALTH OF MASSACHUSETTS

**ESSEX, ss.**                                                    **SUPERIOR COURT**

<table>
<tr>
<td>

LISA MACKEY-FUENTES,

       Plaintiff,

       v.

SHAW'S SUPERMARKETS, INC, RAYE
WARD, JENNIFER JOHNSON, KIRBY
SHIRK, and JAMES HALL,

       Defendants.

</td>
<td>

**RECEIVED**

1/24/2022

CIVIL ACTION NO. _____


**JURY TRIAL DEMANDED**

</td>
</tr>
</table>

## COMPLAINT AND JURY DEMAND
## INTRODUCTION

1.      Plaintiff Lisa Mackey-Fuentes ("LMF") brings claims against her former

employer Shaw's Supermarkets, Inc. ("Shaw's") and individuals Raye Ward ("Ward"), Jennifer

Johnson ("Johnson"), Kirby Shirk ("Shirk"), and James Hall ("Hall") (collectively "Defendants")

for discrimination and hostile work environment both on the basis of her disability, failure to

accommodate her disability, as well as sexual harassment (hostile and sexually charged work

environment), and gender (female) discrimination, and retaliation in violation of M.G.L. c. 151B,

§§ 4(1), 4(4), and 4(16) (against all Defendants) as well as Title VII of the Civil Rights Act of

1964, 42 U.S.C. § 2000e, *et seq.* (against Shaw's only). LMF also asserts an interference with

Family and Medical Leave Act claim in violation of 29 U.S.C. § 2601 *et seq.* (against all

Defendants) and the Americans with Disability Act, 42 U.S.C. §§ 12181, *et seq.* (against Shaw's

only).

2.      LMF worked for Shaw's from January 24, 2017, until her wrongful termination

on January 23, 2020.

3.      As set forth in detail below, the facts of this case show how Shaw's subjected LMF to a continuous and unrelenting hostile environment in which Shaw's forced her to endure ongoing and countless instances of sexual harassment. LMF reported the sexual harassment multiple times to Human Resources (Johnson and Ward) and Shaw's managers. Shaw's allowed the sexual harassment to continue unabated, and it caused LMF extreme emotional distress exacerbating her anxiety and causing her depression.

## PARTIES

4.      LMF is a citizen of Massachusetts residing at 295 Pawtucket Blvd., Unit 6, Lowell, MA 01854 in Middlesex County.

5.      Upon information and belief, Shaw's is a Massachusetts corporation with its principal place of business located at 750 W. Center Street, West Bridgewater, MA 02379 in Plymouth County. Shaw's owns and operates a distribution center located at 100 Danton Drive, Methuen, MA 01844 in Essex County. At all times relevant to this matter, Shaw's employed more than 15 employees.

6.      Upon information and belief, Ward is a citizen of New Hampshire residing at 38 Colt Lane, Epping, NH 03042. Ward was the Human Resources ("HR") Manager at Shaw's Methuen, MA location, in Essex County.

7.      Upon information and belief, Johnson is a citizen of Massachusetts residing at 268 Main Street, #341, North Reading, MA 01864 in Middlesex County. Johnson was the Human Resources Generalist at Shaw's Methuen, MA location.

8.      Upon information and belief, Shirk is a citizen of New Hampshire residing at 24 Barker Road, Stratham, NH 03885. At all times relevant from September 2018 until her termination on January 25, 2020, Shirk was LMF's manager.

9.      Upon information and belief, Hall is a citizen of Massachusetts residing at 807 Summer Street, Manchester, MA 01944 in Essex County.

## JURISDICTION, VENUE, AND EXHAUSTION OF REMEDIES

10.      The Superior court has subject matter jurisdiction over this action under M.G.L. c. 151B, §§ 4(1), 4(16), and 4(4). This Court also has jurisdiction over Defendants pursuant to M.G.L. c. 223A, §§ 2 and 3.

11.      Pursuant to M.G.L. c. 223, §§ 1 and 8, venue is proper because Plaintiff and all individual Defendants were employed at and conducted business out of Shaw's distribution center located at 100 Danton Drive, Methuen, MA 01844 in Essex County.

12.      LMF has satisfied all conditions precedent to the commencement of this lawsuit:

(a)      LMF filed a charge of employment discrimination with the Massachusetts Commission Against Discrimination ("MCAD") on November 10, 2020, within 300 days of the commission of the unlawful employment practices alleged herein. LMF cross-filed her charge at the Equal Employment Opportunity Commission ("EEOC"). The MCAD investigated her claim.

(b)      In the midst of the MCAD investigation, LMF exercised her right to withdraw her Charge on March 3, 2021.

(c)      On March 30, 2021, the MCAD dismissed the charge and closed its file.

(d)      LMF received a right to sue letter from the EEOC on January 20, 2022.

## FACTS

### Background Facts: LMF's Employment at Shaw's

13.      On January 24, 2017, LMF commenced her employment as a Department Specialist III working in a trailer/office inside the warehouse called "Door 19." Also, on the premises ("up front") is a more traditional office setting where HR and Accounting were located. At Door 19, her responsibilities included checking in vendors who delivered to Shaw's, making

sure the delivery was unloaded properly and checking the vendors' order forms to verify the delivery of the correct items ordered.

### Male Warehouse Employee's Begin Sexually Harassing LMF

14.     After her first few weeks of employment, LMF began noticing that a lot of the male warehouse employees, who were usually members of the union, stared at her and "gawked" at her. LMF tried to "brush it off" and not let it "get to [her]." Sometimes, the male warehouse employees would say additional comments to her such as "you look pretty today," "I like your hair color," and "those jeans look nice on you."

15.     The mistreatment escalated in the Summer of 2017; one of the union members started making comments about LMF's chest, and another employee suggested that she "cover-up" and "zip-up" her sweater and wear "baggy shirts" to keep the men from "looking down" her shirt and making comments. LMF reported this mistreatment to the Supervisor of the Warehouse Operations, Brian McClelland ("McClelland"). LMF did not experience any other incidents with the men in the warehouse before McClelland left Shaw's in early 2018.

### McClelland Leaves Shaw's and Male Warehouse Employees Restart Their Harassment of LMF

16.     After McClelland left, LMF began slowly having issues with the warehousemen again. For instance, some examples include male truck drivers that delivered to Shaw's and the unloaders who worked for Capstone Logistics, LLC ("Capstone"),[1] would "hit on her," making her feel "so disgusted" that she no longer wanted to work in her position because she felt she was working "too close" to the truck drivers and unloaders. Additionally, on "Sports Day," comments were made by Rusty l/n/u, Shaw's supervisor who was stationed in Wells, Maine but was

---

[1]     Capstone is a warehouse logistics services company that performed onsite transportation management – LMF shared an office space with Capstone.

helping out during a "conversion" at the Methuen location, saying she was "dressed like a tramp." When LMF reported this mistreatment, Johnson and Ward told her to "keep it professional."

### LMF is Sexually Harassed by IT Consulting Vendor's Employee

17.     Later in January 2018, Shaw's converted to new software and hired an IT consulting firm to travel to different locations to train employees. LMF attended a group training class led by the IT consulting firm's employee Elmer Turner ("Turner"), who frequently made LMF uncomfortable by staring at her and standing too close to her when he showed her how to use the software, flirting with her, trying to slip his hotel key under her thigh (January 8, 2018) and another time under her binder, and text messaging her on her cell phone without permission. Frequently, LMF tried to skip training sessions because Turner made her too uncomfortable.

18.     After Turner left Shaw's when training was over (he was there for a few months), LMF reported these incidents to Johnson and Ward in HR. Ward and Johnson told LMF that there was not anything that they could do because Turner was no longer at their Shaw's location training and she did not "report it right away."

### Supervisor Christopher Capozzo Sexually Harasses LMF and Male Warehouse Employees Continue to Sexually Harass LMF

19.     On April 21, 2018, LMF e-mailed Warehouse Supervisor Christopher Capozzo ("Capozzo") and asked him if he knew of any openings in Shaw's that would allow her to move away from the receiving window where LMF currently worked. Capozzo told her that he did not know of any job openings. Later, Capozzo called her from the Supervisors' desk. Capozzo told her to "take the phone off speaker," she did, and he told her, "there are other ways to make money. Snapchat." LMF asked: "Snapchat is hiring?" Capozzo told her that she could "make more money on Instagram or on the internet taking pictures or making videos." Capozzo

continued saying, "there is a website that if you do stuff on webcam and take certain types of pictures, you would make a lot of money. I tried to do it, but I did not make much money because I am not attractive. You have potential and could make a lot of money." Capozzo told her she could make "six figures."

20.     LMF hung up the phone and immediately told Supervisor Mark Gambeski ("Gambeski") and Susan (Shaw's employee l/n/u), who were both in the trailer with LMF, what had happened. Gambeski called Capozzo from LMF's desk and told him that if he kept saying these things, he would speak to HR. Capozzo told him it was "a joke." Gambeski laughed and hung up the phone. LMF was shocked that this was how a supervisor handled her complaint.

21.     At the end of June 2018 and again in August 2018, Capozzo sent LMF e-mails with links to one-bedroom apartments in Florida and gave her his phone number. Capozzo told LMF that he was looking for a job in Florida and that she should move down to Florida with him.

22.     In the Summer of 2018, LMF learned from a Capstone supervisor that the men in the warehouse continued to ask questions about her, including "why she was such a distraction in the office," questions about her age, whether she was mixed nationality, and if she was single. A few warehouse employees told her that there were "rumors going around" about her "sleeping with many people at the warehouse" and "giving all the men a disease." Learning of these comments and this rumor caused LMF an immense amount of anxiety and fear going into work. The nearly day-to-day environment consisted of LMF being catcalled, leered at, and hearing rumors being spread about her.

**Mental Health History and the Adverse Impact of the Hostile Work Environment
Caused LMF to Begin Missing Work**

23.     Three years before working at Shaw's, LMF had been diagnosed with bipolar

disorder, depression, and generalized anxiety disorder. Despite this earlier diagnosis, with

medication LMF was able to function in the workplace and live her life without these conditions

limiting her. In fact, LMF had successfully worked various jobs while managing her conditions –

LMF's mental health had been very stable since her initial diagnosis.

24.     However, the hostile work environment at Shaw's exacerbated LMF's mental

health conditions. LMF began suffering from extreme anxiety and depression and feared going

into and being at work. Shortly thereafter, at the end of July or early August 2018, when she

learned of the false rumors circling the warehouse about her, LMF's anxiety and depression

worsened. This aggravation of her conditions was a direct result of the sexual harassment at

Shaw's, which Shaw's allowed to continue despite her repeated complaints to HR and other

managers.

25.     LMF's psychiatrist determined that she needed to alter her medications to attempt

to treat her deteriorating conditions. Because her psychiatrist had been adjusting LMF's

medications (experimenting with new anxiety and bipolar depression medication), LMF

experienced reactions, such as withdrawals and medication side effects as she was adjusting to

the new medication and dosages. Because of her worsened conditions, the changes in her

medication, and the anxiety flare-ups that she had been experiencing, LMF had been calling out

sick to work. Her Supervisor Mark Halliday ("Halliday"), began giving her a difficult time when

she let him know she had to call out sick. LMF was concerned because when she called out of

work, Halliday texted that "it was making it hard for [him] to do the schedule and [he] might

have to see what will be done about it."

26.     When she returned from one of her absences, LMF scheduled a meeting with Johnson and Halliday to discuss whether he was having an issue with her from being out sick. Halliday interjected, saying that he did not have a problem with LMF, she was an excellent worker, and he was not sure why it "got to the point that HR was involved." LMF indicated she felt Halliday was threatening her job after she had been out of work (treating her mental health, of which Halliday was aware)[2] so she wanted to know if he had any negative feedback and she would want it known and recorded with HR.

### The Sexual Harassment Continued into the Late Summer of 2018

27.     One morning in August 2018, LMF was sitting in the office in the warehouse and felt "so sick and tired" of the warehouse workers staring at her – she desperately wanted privacy. LMF took two blank pieces of paper and covered up the window in the trailer so that the window still functioned, but she could have some privacy. Less than an hour later, Gambeski told LMF that she had to remove the papers.

28.     On August 22, 2018, LMF met with Johnson and Ward in HR to discuss the ongoing sexual harassment she had been experiencing. LMF told them about the rumors that were circulating and that they made her "very uncomfortable." Johnson and Ward told her there was "nothing we can do" because they "heard" it was a "friendly, close environment down in the warehouse" and everyone "including hourly, supervisors, and even Capstone, all joke and get along." Johnson and Ward told LMF that if she wanted to reply to Capozzo's e-mail about Florida apartments and let him know she is not interested, she can do so but "keep it professional," or she could forward the e-mail to Ward and she will speak to him. LMF told them

---

[2]     LMF had been very open with Halliday and others regarding her mental health, and she even took her medication out in the open at her desk.

that she "tried to ignore the guys and exclude [herself] from their conversations." Johnson and Ward told her that "you still have to keep it professional and not give a bad attitude." Johnson and Ward ended the meeting and told her that if anything else made her uncomfortable, to let them know.

29.     On August 24, 2018, Capozzo went down to LMF's office and told her that they should "hang out someday and go to eat and get ice cream or watch movies and just chill." LMF tried to ignore him and turned towards her computer to proceed to work. After Capozzo left, LMF asked another co-worker who worked in the trailer (Edward) if she did or said anything to look for "that kind of attention," and he said, "no, you did nothing. I am a man, I know Cappy was flirting." LMF went to HR and told Ward and Johnson what had happened. They asked her what her response was, and she explained that she tried to ignore him. They then asked LMF to write a statement and told her they would speak to Capozzo and let him know that unless it was "work-related," he should not speak to LMF. Ward told her that "he might try to apologize." LMF insisted that she would prefer he did not contact her at all unless it was work-related.

30.     Sometime in mid to late August 2018, LMF decided that she could no longer tolerate the constant sexual harassment and asked to meet with Halliday and Hall, the Director of the Warehouse. In the meeting, LMF told Halliday and Hall that she wanted to give her "two weeks' notice" because she "did not want to deal with that environment." Alternatively, LMF asked if she could move to a position "up front" into the office and out of the warehouse. Hall strongly suggested he did not want LMF "to quit" and told Halliday to "deal with the issues going on in the warehouse." After the meeting, Hall told LMF that "there would be a position upfront opening soon since someone was retiring." LMF applied for the position, interviewed,

and was hired for another Department Specialist III position[3] that was located "up front" in the main office.

### LMF Obtains a New Job in the Front Office

31.     Beginning in September 2018, LMF started working "up front" in the main office. At first, LMF felt more comfortable "up front" because she did not have to interact as closely with the men in the warehouse, although she still had to walk through the warehouse when she had to run bi-monthly payroll for the union workers.[4]

### The Sexual Harassment Continues Unabated and LMF's Mental Health Worsens; LMF Applies for Leave Under the Family Medical Leave Act

32.     Towards the end of 2018, LMF began hearing the "rumors" about her "giving men diseases" more frequently – almost daily. During this time, LMF started experiencing even worse anxiety and depression, had difficulty concentrating, and was anxious while at work. LMF did not want to wake up in the morning because she feared going to work – her mental health began deteriorating further. LMF began seeing her doctor more frequently, and her doctor continued to adjust her medication.

33.     On or about February 25, 2019, LMF applied for FMLA leave (through Shaw's third-party administrator, Albertsons' Companies) on her doctor's advice because of her

---

[3]     Department Specialist III is a position title that encompasses many roles at Shaw's. LMF applied for a new position (same role) that would allow her to work on the premises but outside of the warehouse.

[4]     In her new position, LMF was responsible for the following tasks: reimbursing mileage and handling credit card receipts for Shirk and other managers; handling accruals and budgets for accounts payable (Hall was her supervisor for this task) which she sent to the corporate office in West Bridgewater; handling clothing orders for the warehouse workers; researching and ordering items to boost employee morale; ordering employee birthday lunches; ordering flowers and baskets for bereavement; warehouse recycling plastics, cardboard, and pallets; opening daily mail for bills and invoices related to maintenance and sanitation; maintaining spreadsheets for the utilities department (including sending these spreadsheets to the corporate office); looking up payment information for vendors and handling their payment; updating union logs for seniority (with respect to different employees leaving and new employees being hired); and typing up reports for new hires, job performances, and grievances for union employees.

immensely increased stress, anxiety, and depression from the continued sexual harassment. LMF's psychiatrist was still trying to regulate her medications and LMF was still experiencing anxiety flare-ups and side effects from her medication. Initially, LMF's psychiatrist recommended that LMF take a 20-30-minute break for her anxiety flare-ups and that, if necessary, for her to have the rest of the day off from work. Her psychiatrist recommended taking intermittent FMLA leave on days when she experienced adverse reactions to the medication. After some back and forth between her psychiatrist and Shaw's (HR made her doctor clarify the FMLA request multiple times), Shaw's (through Shaw's third-party administrator, Albertsons' Companies) finally approved her intermittent FMLA from February 28, 2019 - February 28, 2020. LMF also submitted documentation requesting short-term disability ("STD"), and Shaw's/Albertsons' Companies approved her STD request.

34.     Later in late February or early March 2019, LMF's doctor requested an increased leave frequency, indicating that LMF would need to take intermittent leave of one to two episodes per month, each lasting two to three days due to her evolving medical conditions and the side effects of changing the doses of her medication . Shaw's rejected LMF's psychiatrist's request, and LMF was forced against her doctor's recommendations to work under the initial FMLA intermittent leave that Shaw's had approved.

35.     Beginning in February 2019, throughout the remainder of LMF's employment at Shaw's, LMF saw her psychiatrist either bi-weekly or monthly.[5] When LMF's psychiatrist needed to change out a medication completely, LMF met with her weekly to monitor these adjustments. Depending on the severity of her condition, LMF would have more or fewer episodes.

---

[5]     In fact, LMF still sees her psychiatrist monthly as of the date of this filing.

36.     LMF took intermittent FMLA leave on the following dates while she was adjusting to her medications: February 15-23, 2019; March 7-9, 15-16, 23, and 26-29, 2019; April 11-12, 25-27, and 30, 2019; May 21-24, 2019; and June 28-29, 2019.

37.     On April 15, 2019, LMF and her doctor applied for leave from April 15, 2019, to May 18, 2019, for "varied flare-ups" "from 1 hour [per day for] 1-2 days per 1-2 months." This leave was approved by HR.

38.     At the end of March or early April 2019, Ward and Johnson told LMF that her doctor needed to change the "number of episodes" on her FMLA paperwork so that it matched the days she had been out on leave.

39.     Around the end of March or early April 2019, Hall asked LMF to train another employee Sylvie (l/n/u), on her accounts payable tasks so that Sylvie could be her "back-up" while LMF was on FMLA leave. LMF trained Sylvie as directed.

40.     While LMF was working with her doctor to try to find an effective mix of mediations and taking days off intermittently, the harassment continued.[6] Further, LMF felt that nothing she could do, even downplaying her appearance by not wearing makeup or wearing baggy shirts, could stop the male attention (staring and talking about her and her body as she walked by). This made LMF extremely nervous, and she felt like she always had to watch her back. LMF was so mortified by these rumors (they made her feel "disgusting") that she did not even want to bring up the content of them with HR and preferred to call them "rumors." Further, at this time, LMF started complaining to HR less frequently as she felt that it was "useless"

---

[6]     The rumors about LMF's "giving [warehouse men] diseases" continued while LMF was in the office perpetuating and exacerbating her medical conditions and LMF feared what was being said about her when she was out on intermittent FMLA leave. When LMF returned to work and felt the male warehouse employees stare at her as she left work each day and talked about her as she walked by them, LMF felt even more apprehensive about returning the next day.

because HR never handled her complaints or remedied the environment. She also feared they did not take her seriously because they told her the warehouse was a friendly environment and that *she* had to keep being professional and work with them.

41.     The continued sexual harassment and LMF's resulting fear of coming into work took such a significant toll on her mental health that LMF's mental state deteriorated further. In fact, LMF's mental health had worsened so much that on May 1, 2019, LMF's mother found a suicide note and rushed LMF to a local hospital emergency room. After telling ER attendants that she "no longer wanted to live," the hospital doctors recommended that LMF be transferred to Holy Family Hospital, Methuen, MA psychiatric ward to treat her depression and anxiety. LMF was admitted for seven days to treat her anxiety and depression. LMF checked out of the hospital on May 6, 2019, and was out of work for an additional week on FMLA to recuperate upon her doctor's recommendation. LMF's psychiatrist recommended that she not rush back into work "too quickly" and give her time to readjust her medication. LMF had never previously been rushed to an emergency room or committed to a psychiatric ward because of anxiety and depression.

42.     LMF submitted additional doctors notes regarding her continued care:

   a. On May 9, 2019, in a doctor's note, LMF's psychiatrist submitted paperwork to Shaw's stating that she could return to work on May 13, 2019, subject to the previously approved intermittent FMLA leave. LMF's psychiatrist also indicated that LMF would need an accommodation of "generally no more than one hour" per day to deal with mild anxiety flare-ups her and reactions to medication. Her psychiatrist also indicated that if her symptoms were moderate to severe, LMF would require up to three days per episode and two episodes per month.

   b. On May 10, 2019, LMF's psychiatrist clarified the prior doctor's note, requested the same accommodation as the earlier letter (HR requested a doctor's note), and indicated that LMF was out of work between April 30,

2019, through May 12, 2019, in order to stabilize her symptoms. Her doctor again stated that her return-to-work date was May 13.[7]

### After her Hospitalization, LMF Returns
### to Work and Shaw's Changes her Job Duties

43.  On May 13, 2019, Ward called LMF and told her that she would be reporting to work the next day (upon her return from FMLA) at 9:00 AM (LMF had Mondays off, so she would return that Tuesday). Ward also told LMF that she would be meeting with Hall and Johnson the following day to discuss the changes they had made to LMF's job responsibilities. LMF e-mailed Ward after the call to ask if she was being demoted. Ward told her that she was not being demoted and would receive the same rate of pay.

44.  On Tuesday, May 14, 2019, LMF returned to work. Just after 9:00 AM, Johnson came over to LMF's desk to see if she had a "minute to go to Jim's office for a meeting." LMF went into Hall's office (in addition to being the Director of the Warehouse, Hall assigned her accounts payable tasks) where LMF's managers Shirk, Johnson, and Hall were waiting at the table. Johnson explained that LMF's accounts payable tasks would be given to Sylvie (l/n/u) and that LMF's main responsibilities would be PMC (Shaw's computer program) and dealing with warehouse recycling. Johnson also told her that she would be "back up to Sylvie and crossed trained in billing." Johnson told LMF that her schedule would be 8:00 AM-4:00 PM, Tuesday through Saturday.[8]

---

[7]     LMF was concerned that Shaw's would count those absences against her or would not let her return to work without a note excusing her absences because Johnson seemed to keep requesting a doctor's note even though LMF was on FMLA. Johnson later "backtracked" and stated that LMF did not need a doctor's note because she was on FMLA.

[8]     Before the May 14th meeting, LMF never had a set schedule, she was frequently told to come into work at 6:30 AM, 7:00 AM, or 7:30 AM, and she would leave around 5:00 PM or later depending on what needed to be done that day and whether her managers needed her in earlier or later. After this meeting, Shaw's never asked LMF to come in early or approve her to stay past 5:00 PM. In fact, she was asked to start coming into work at 9:00 AM.

45.     After the May 14, 2019 meeting following her taking off some days under FMLA, LMF felt as though some of her job duties were slowly being taken away from her. Further, sometime before LMF went out on FMLA leave, she was told she would learn billing processes as well, but after she disclosed her disability and took some FMLA leave days off, she never heard about this training again.

46.     After some clarification, HR approved LMF's request for a one-hour per day accommodation to leave her desk for the remainder of the year. However, HR indicated that if LMF left the building, she would be required to clock out, she would only be paid for a half-hour, and it would be considered her lunch break. HR told LMF this was because lunch was paid and if she did not leave the building, she did not have to clock out.

47.     On May 15, 2019, LMF went into Ward's office to speak to her to obtain a copy of her job responsibilities in writing for her doctor. In fact, LMF wanted a copy of her job description for herself because she was very concerned that they kept stripping her duties away after she had been out on FMLA leave. Ward told LMF that they could not "put together a specific job role description because you are still a Department Specialist III which can cover a lot of different roles and responsibilities." Ward also explained that everyone at Shaw's is "cross-trained" for different roles but has the same "Department Specialist title." Ward told LMF that she was not "demoted, but due to us not knowing when you will be in or out [due to taking FMLA], we can't have you as the primary" for accounts payable. Ward explained that LMF would report to Shirk. Ward also told LMF that "if down the road your medications stabilize, then we may do some more change in the accounts payable role." To LMF, it seemed that the accounts payable duties were being taken away from her in retaliation for taking FMLA leave.

48.     On June 19, 2019, because her FMLA hours were running up and because Shaw's frequently requested return to work paperwork, LMF's doctor requested a workplace accommodation for mild flare-ups to "include allowing her to take some time alone (up to one hour) for the symptoms to pass. If symptoms are moderate to severe, she will require up to 3 days and 2 episodes per month." Her doctor indicated she could return to work on June 25, 2019.

49.     On or about June 27, 2019, LMF called the employee hotline to report that she believed she was being "discriminated against for taking FMLA leave." LMF feared Shaw's had been taking more and more of her duties away as a direct result of her taking FMLA leave.

**LMF's Symptoms Continue/LMF's Doctor Requests
Workplace Accommodations After Her FMLA Hours Extinguished**

50.     LMF was out from July 5-15, 2019 (July 7, 8, 14, and 15 were LMF's regular days off work) due to a cold. LMF told Johnson and Ward that this was not related to her previously approved FMLA leave. Because switching her medication weakened her immune system, her psychiatrist believed the cold could have resulted from her disability. Because HR would frequently not let LMF back into work without a doctor's note or generally gave her a hard time for being out of work (such as taking her primary duties away), her psychiatrist started to habitually provide LMF with a return to work note and a request for an accommodation.

51.     In early July 2019, HR told LMF that she would use up her available FMLA leave in the next few weeks.

52.     Throughout this time, LMF had been in and out of the office treating her mental health. When she returned to work, she continued to experience sexual harassment (the rumors circulated and when leaving work and the warehouse workers would leer at her and talk about her).

**Shaw's Third-Party Benefit Company Reapproves LMF's FMLA starting February 29, 2020 and LMF Reapplies for an Accommodation for Her Flare-ups and Adjustment to Medication**

53.     Shaw's informed  LMF that she had exhausted her initial FMLA leave on or about July 27, 2019. However, upon information and belief, Shaw's ended LMF's FMLA leave prematurely because Shaw's incorrectly counted non-FMLA related absences as FMLA.

54.     LMF requested the following workplace accommodations:

    a.  On July 10, 2019, LMF's doctor submitted paperwork requesting a workplace accommodation that would allow her to take "some time alone (up to one hour) for the symptoms to pass." Her doctor also requested an additional reasonable accommodation for "[I]f symptoms are moderate to severe, she will require up to 3 days per episode and 2 episodes per month." Her doctor's note indicated that she could return to work on July 16, 2019. After returning to work, LMF took a few more days off to treat her mental health and flare-ups.

    b.  On July 19, 2019, LMF's psychiatrist submitted paperwork requesting a follow-up workplace accommodation for "... Lisa during any mild flare-ups would include allowing her to take some time alone (up to one hour) for the symptoms to pass. If symptoms are moderate to severe, she will require up to 3 days per episode and 2 episodes per month." Her doctor also indicated that she could return to work on July 23, 2019.

    c.  On July 24, 2019, LMF's psychiatrist submitted a follow-up workplace accommodation request for her mild flare-ups to allow her to take time alone (up to one hour) for the "symptoms to pass." As well as stating that the "current symptoms have been severe and have been up to 5 days per episode and more than 2 episodes per month." Her psychiatrist also indicated that LMF had been experiencing more symptoms than expected and that she had been working with LMF to adjust the medication, which should relieve the symptoms. Her psychiatrist indicated that it was difficult to predict when symptoms will be "more controlled" but that it was "generally expected that these flare-ups will become less in the next 6 to 8 weeks as the medication becomes more effective." Shaw's failed to respond to LMF's psychiatrist's July 24, 2019workplace accommodation request.

    d.  On July 26, 2019, LMF provided Shaw's a letter from her psychiatrist stating that LMF had been seen at the office that day and required a "medication adjustment to reduce her symptoms." And that the increase in medications would take a "few days to become effective." Her doctor stated that she would not be able to "perform work-related activities as of July 26, 2019, and will be re-assessed in 2 weeks for an expected return to work date of August 12, 2019."

e. On or about July 26, 2019, Shaw's third-party benefit company Albertsons' reapproved LMF's FMLA leave starting February 29, 2020, for two episodes every month for up to five days of incapacity. Also, on July 26, 2019, LMF's doctor submitted a letter to Shaw's requesting a continued accommodation which mirrored the conditions of her previously approved intermittent FMLA leave (she used up all her hours earlier that month) because of her continued anxiety flare-ups and reactions to the adjustments to her medications.

f. On August 2, 2019, LMF's psychiatrist submitted a workplace accommodation request "for Lisa during any mild flare-ups would include allowing her to take some time alone (up to one hour) for symptoms to pass. If symptoms are moderate to severe, she will require up to 3 days per episode and 2 episodes per month." Further, her psychiatrist indicated that she could return to work August 6, 2019, with these accommodations and that it was her "medical opinion that Ms. Mackey-Fuentes can resume all work activities with restrictions."

55.     Because she had extinguished her FMLA hours, HR told LMF that she needed to contact the Leave of Absence team – after doing so and getting assigned a case manager, LMF and her doctor submitted the requested documentation to be submitted for short-term disability. LMF went on short-term disability for her two-week absence from work (from July 26 to August 12) to adjust to her medication.

56.     On August 5, 2019, Ward told LMF that she could not return to work and would have to be put on disability leave unless she had "no restrictions or any type of medical leave" because of her "chronic condition." LMF's psychiatrist had indicated that she could return to work on August 6, 2019, because her flare-up had passed. Ward told LMF that she could not return to work and that her position was being "primarily filled." LMF believed she could perform her job duties if she was provided the requested accommodations outlined in her doctor's accommodation request form of up to two episodes per month; however, she was terrified of not having a job and agreed to only take a one-hour accommodation to leave her desk instead of her doctor's recommendation. Ward told her that she needed a letter that said that she only needed to take a one-hour accommodation to leave her desk – thus, telling her to submit a

different accommodation request than what her doctor requested, without considering LMF's initial accommodation request. After submitting the revised accommodation request, HR approved this accommodation, and LMF was able to return to work. HR effectively denied LMF's accommodation request for her moderate to severe flare-ups without y investigating whether they could accommodate her further. Thus, failed to engage in the interactive process with respect to LMF's accommodation request.

57.     Shaw's never full fully restored LMF's job duties to full capacity.

### Sexual Harassment Continues/LMF's Condition Worsens/Shaw's Disciplines LMF for Absences Related to Her Disability

58.     During this time, whenever LMF returned to work, she would continue to hear the rumors about her "giving men diseases"[9] and when she would walk by the warehousemen, they continued to leer at her, point at her, and openly discuss her appearance. Further, in September 2019, LMF received a receipt security that had a heart next to her name on the envelope,[10] and a warehouse supervisor Elvis (l/n/u) frequently told LMF that she was "so pretty" in Spanish, she "shouldn't be single," and she "should have a man." Elvis also made references to growing out his beard to "look older for her" so that "maybe you'll be interested in me."[11] The totality of the

---

[9]     Warehousemen would ask LMF if she had been sleeping with other warehousemen and ask her if it was true that she had been "giving [these men] diseases."

[10]     LMF spoke to security to identify which employee drew a heart next to her name. She was told it likely was Anthony, who they call the "flirt." LMF immediately reported this to Ward and Johnson in HR, who tried to "match the handwriting" to security logs, but they did not have any paperwork. Later, they told LMF that they spoke to Anthony, and he said he could not remember speaking to LMF or any envelope or receipt. Ward and Johnson told LMF that it was a "dead end." LMF asked them to look at the security cameras and check the door codes because someone would have had to swipe their badge to enter the office. Instead of investigating this further, Ward and Johnson told her there was "nothing [they] can do."

[11]     On October 10, 2019, Elvis came by LMF's desk, implied she looked like "Dora the Explorer," and asked if he was "harassing her" "because [he] keep coming over here trying to talk to [her]."

sexual harassment continued to make her uncomfortable and self-conscious at work and took a

serious toll on her mental health and significantly delayed her recovery.

59.     Again, the rumors about LMF continued almost daily and when the

warehousemen stared at her, she could sometimes tell that they were whispering about her—this

made her terrified that they were continuing to spread these offensive rumors about her "sleeping

with men" and "giving them diseases." Further, the warehousemen continued to stare and talk

about her appearance when she walked by on her way to the car each night. LMF felt

increasingly nervous about coming into work and dreaded walking to her car after work. The

constant attention made her crawl out of her skin. No matter what she did to "lessen" her

appearance, the behavior continued. The continued harassment from both Elvis, the security

officer, and the men in the warehouse took its toll on LMF, and she experienced continued

anxiety flare-ups which caused her to be slightly tardy for work, leave early, or be absent from

work. Additionally, LMF continued to experience reactions to her medications, making it

difficult for her to be at work. The hostile work environment at Shaw's, which LMF reported to

HR on multiple occasions, never ceased and caused continued anxiety flare-ups. If Shaw's took

LMF's legitimate complaints more seriously and addressed the continued sexual harassment at

work, LMF's condition could have improved. Further, because Shaw's denied LMF's doctor's

request for her to take time off work to deal with her flare-ups, these absences were counted

against her.

60.     By this point, the circumstances LMF experienced had become a vicious cycle.

She would experience harassment, which caused her flare-ups, which caused her to miss work,

which caused her doctor to sometimes recalibrate her medications. LMF would return to the

workplace, and because Shaw's never remedied the harassment LMF experienced more harassment, and the cyle would start again.

61.     Starting in approximately mid-late September 2019, LMF began looking for alternative jobs within Shaw's so that she could avoid the warehousemen.

### Shirk Begins Taking Away LMF's Tasks and Retaliating Against Her for Taking Protected Leave and for Using a Workplace Accommodation

62.     By October 2019, most, if not all, of LMF's primary duties had been reassigned, so she took it upon herself to seek out work. LMF frequently let her managers know she was at work and ready to perform tasks each day.

63.     On October 8, 2019, LMF told Shirk she had arrived at the office and was ready to perform her tasks. Shirk ostracized LMF.  He was very "short" with her and told her he "handled accounts payable on Monday with Karen Putnam, and as far as I know, it is all set."[12] The mistreatment from the warehouse workers and the way management treated her made LMF incredibly anxious.[13]

64.     Later that same day, LMF spoke to Ward and Johnson and asked them to officially remove her from accounts payable because most of her tasks had already been given to her coworker, Sylvie. LMF was concerned because Sylvie had made mistakes on the tasks and LMF was afraid she would be blamed for these mistakes and "inconsistencies." LMF also told them that she needed to clarify her responsibilities, because she was confused as her job duties had been changed so much. Ward told her that she spoke to LMF about her "dipping into

---

[12]     Because Mondays were Sylvie and LMF's scheduled day off, LMF was not sure why Shirk acted like he was upset that she had not been at work the day before (Monday) – LMF concluded, based on Shirk's demeanor and attitude surrounding her absences, that he was upset that she was out of work so much for her disability.

[13]     Following this incident, LMF sent Ward an e-mail to speak to her about LMF being removed from her accounts payable tasks.

different roles and responsibilities, but you would need to be present and not absent in order for them to consider her in anything else."

65.    LMF also asked Ward about the discipline policy because she already had a verbal warning. Ward told LMF that "next would be a written then a final written, then termination, which can be spread out throughout time or it can happen very quickly" and that she will have to get "in touch with [Shirk]" and "see what he wants to decide since you have been late as well as leaving early and absent since your write-up." LMF was late and leaving early due to her disability.

66.    Throughout this period, the harassment from the warehouse workers (including spreading rumors about her giving warehousemen "diseases") made LMF increasingly uncomfortable going into work and caused her anxiety and depression to worsen.

**LMF Attempts to Seek HR's Assistance by Making an Additional Complaint About the Sexual Harassment She Had Been Experiencing at Shaw's**

67.    Although she feared it would be futile based on her prior experiences with HR, on October 15, 2019, LMF had a meeting with Ward and Johnson regarding her sexual harassment complaints, including the incidents with Elvis, the heart on the envelope, and the frequent comments made about her by warehouse employees as she left the building. LMF also explained that she does not feel comfortable reporting the sexual harassment from the warehousemen because "they all know I have been speaking to HR." Ward and Johnson told her that they did not know how others would know because "it is confidential." LMF explained that she heard that Glen, the Superintendent, told second shift employees to stay away from her because she "will report them to HR." LMF also told Ward and Johnson that she felt she had "to stop wearing makeup, doing [her] hair, and dressed down to avoid the attention."

68.     Ward and Johnson asked LMF to identify the individuals who harassed her from the "second shift." LMF told HR that she does not know the names of the men who harassed her. Ward told LMF that they could possibly have a "supervisor outside to watch and see if anything happens." LMF told them she did not think that would help because the "supervisors will probably tell the other guys what is going on." Ward told LMF that they "interviewed" Capozzo, and Ward believed he "let everyone know [that LMF made a complaint about him] before he left the company." Ward also said, "it is confidential, and [Capozzo] was made aware of any retaliation for repeating the report you made." Because LMF was afraid of retaliation and the situation worsening, she was nervous to have a supervisor watching her leave and go to her car.

69.     Ward and Johnson had her repeat the comments Elvis and the second shift workers said to her. LMF repeated what she had told them and reminded them that this had been going on since she started working at Shaw's. Ward and Johnson asked LMF to describe again the security guard she believed left the envelope with the heart on it – they then said they think they know who she was describing because his hair is "different."

70.     Further, LMF told Ward and Johnson that she is not comfortable working in the building anymore due to the ongoing harassment including rumors about her "sleeping with men" and "giving them diseases." . LMF reminded Ward and Johnson that she had been trying to transfer to a position in a different building and that she had applied for any open positions she saw within the company. Both Johnson and Ward indicated that they would check the "status of any positions you applied for."

**Shaw's Wrote LMF Up for Taking Time Off Related to Her Disability Following LMF's Additional Complaints to HR About Repeated Sexual Harassment**

71.     On October 15, 2019, after LMF's meeting with HR regarding her sexual harassment complaints, before LMF went home for the day, Shirk and Ward gave LMF her first

written warning for "poor attendance." LMF was written up for being tardy twice, leaving early

three times, and being absent six days from September 18-October 12, 2019. Ward told LMF that

her warnings would only stay on her record for a year. All of LMF's attendance issues were

directly related to her disability.

72.     The sexual harassment continued unabated, LMF's symptoms continued to flare

up, and she continued to react negatively to her medication adjustment. The vicious cycle

continued.  As a result, LMF still needed to take days off work for her treatment.

73.     LMF was out of work related to her medical condition from October 19, 2019, to

October 28, 2019. Because her FMLA was extinguished, Albertsons approved LMF for Shaw's

Non-Occupational Medical Leave of Absence.

74.     LMF continued to not feel well and applied for additional leave through

November 7, 2019. Shaw's approved her for additional Non-Occupational Medical Leave.

**LMF Continues to Make Complaints to HR Relating to Sexual Harassment**

75.     On November 13, 2019, Hall and Ward provided LMF a Final Written Warning

for being tardy once, an early dismissal, and absent 14 days from October 15 - November 13.

76.     Later that day, on November 13, 2019, LMF had a meeting with Ward and

Johnson. Ward gave LMF an addendum to her October 15, 2019, write-up (one early dismissal

was taken off because it was excused by Shirk). The addendum was dated October 18, 2019, but

HR did not provide this to LMF until November 13. Ward and Johnson went over LMF's sexual

harassment complaints and discussed what they had done to "investigate" them. Ward and

Johnson told LMF that they spoke to "Security," including Anthony, and Anthony told them that

"he can't remember even telling [LMF] who he thought wrote on the envelope." Ward and

Johnson told LMF it was a "dead-end since security doesn't keep records, so we couldn't match

the writing, and since they deny it, we are closing the investigation." Ward and Johnson also told LMF that if she had "any more issues with second shift making comments when you leave," that she could possibly leave through the "transportation" department or use a different door when she left "to avoid future problems." Johnson and Ward also told LMF that Aton Harmon ("Harmon") from the Legal department handled her complaints against Elvis, so they were "unsure what the outcome was, but they are sure Alton went over retaliation and the rules regarding how you're treated from here on out."

77.      LMF questioned her recent write-up because she was on non-occupational medical leave, and her absences should not count against her. Johnson and Ward told LMF that even though she was on "medical leave, it is still considered an absence from work and goes against your attendance." Ward also told her that if "you are moved to a final warning, it doesn't exactly mean termination that all depends on you and if you have any more attendance occurrences." Ward then told LMF that "if you are good and on time, we can reverse write-ups." LMF responded, "That is not what you said to me before." Ward then told LMF that "the write-ups last on your record for a year." Then Ward corrected herself and said: "no, that's incorrect, and if they see you're working on it, they can actually reverse them." LMF mentioned that she did not receive paperwork, a call or anything saying that her non-occupational medical leave was approved. They told her that she needed to speak to the "leave team" because "HR doesn't see any of that paperwork." They also told her that she had to reach out to AmeriBen (the third-party HR consultant that Shaw's used to coordinate benefit requests – LMF had to submit documentation for short-term disability through AmeriBen) directly regarding her disability claim to see what it covered.

**LMF Escalates Her Sexual Harassment Claims to Senior HR Manager
Vicki Sell and Reports Retaliation for Taking FMLA Leave**

78.    On November 13, 2019, LMF e-mailed Vicki Sell ("Sell"), Senior HR Manager,

and reported the numerous complaints she had made to HR regarding ongoing sexual

harassment. LMF also explained that she had been written up due to her attendance and that she

was confused by the policy regarding write-ups. Additionally, LMF stated that she had used up

her FMLA and was told she could go on medical leave but that she could still be written up

while on medical leave. LMF explained that HR had told her that instead of calling out for her

medical condition, she should take medical leave "until [her] condition improves." LMF

indicated that she was very confused about the process and had anxiety about going to work.

79.    On November 14, 2019, LMF called Sell to discuss her many concerns. Sell

explained that "anything not under FMLA should be an occurrence and counted against you."

Sell further explained that "they shouldn't pick and choose what will be covered if it's not

FMLA." Then LMF told Sell that Hall told her that: "if I wasn't out sick on FMLA, this

wouldn't have happened with my job role and being a back up to accounts payable now." LMF

next told Sell that: "I feel like since my FMLA, it's like they are pushing me out the door and

trying to get me out the company." Sell denied that they were "trying to push [LMF] out" and

that "write-ups stay with you for a year they do not drop off. Only occurrences can drop off; I'm

not sure what [Ward] meant about reversing a write-up or dropping one off." LMF responded,

saying that "each time I go into a meeting here, rules are changed. They'll say one thing and

change it and say another." Sell ended the phone call by asking LMF permission to reach out to

Ward and have her meet with LMF regarding possibly taking an extended leave and how that

would affect her. LMF never heard any more about an extended leave.

**LMF Feels Sick and Asks Shirk for Permission to Leave Work Early;**
**Shirk Approves Her Early Dismissal**

80.     Despite the recent meetings with HR, the harassment still continued and did not lessen even after she reported it. On December 27, 2019, LMF was not feeling well, so she asked Shirk in two e-mails and in-person if she could leave early. Shirk asked LMF if he would get in trouble for allowing her to leave early – LMF was very confused and told him that she was not sure, but he was the manager, so he should know. He then asked if all her work was completed to which LMF showed him it was, especially since her workload was slowly reduced following her leaves of absence. Shirk then asked LMF what time she wanted to leave to which she responded, "now." It was between 10:00 AM and 10:30 AM on December 27 – Shirk told her she could leave at "noontime." LMF then asked him for a second time, "will I be okay to leave, or will I get in trouble and fired." Shirk told her, "don't worry about it," and winked at her. He then asked her if she could research some websites for aptitude testing and if she could take a picture and screenshot the utilities spreadsheet she put together and text it to him. LMF completed these tasks before she left at noon. LMF would later learn that this absence would be held against her and lead to her ultimate termination despite Shirk's approval and assurance that it would not.

**LMF Applies for Another Position as a Department**
**Specialist in the Transportation Department**

81.     On January 7, 2020, LMF applied for an open Department Specialist position at the Transportation Department (the other side of the warehouse). LMF thought this position would alleviate the sexual harassment she experienced every day. The Transportation Department also had their own director and managers so LMF could start over, away from Hall and Shirk.

82.     At this point, LMF felt that Shirk and Hall were treating her adversely in retaliation for her taking FMLA leave and because of her continued need for the leave caused by her disability. LMF was worried that they were trying to terminate her for being on protected leave. LMF sent her resume to Johnson to apply for the position. Johnson confirmed that her e-mail was received for the open position in Transportation. LMF hoped that she could finally leave her department and have a fresh start in a welcoming environment.

### Hall Forces LMF to Do a Punishment Job After
### Applying for Position in the Transportation Department

83.     On January 8, 2020, LMF told Hall that she applied for the Transportation position, and he said he did not even know it was available. Hall then told her: "I wish you would have spoken to me before you applied." LMF told him that she was not sure she would get it, but she did not want to be in her regular position anymore. Hall told her that the Transportation department "has their own director and own budget and projections for accounts payable and there is some separation even though it's all in one building." LMF agreed and said she knew that, and it was why she applied for that position. It was clear to LMF that Hall was angry that she had applied for the position. Hall then asked her to clean the supply closet which took LMF two days to clean. Upon information and belief, Hall assigned LMF this task as a punishment for applying for the Transportation department position.

### Shaw's Terminates LMF's Position

84.     On January 15, 2020, Hall arrived at LMF's cubicle and asked her to go to his office so that they could speak. LMF arrived at Hall's office, and Johnson was also sitting at the table inside Hall's office. Hall then sat down, picked up a piece of paper, and proceeded to read from it. Hall told LMF that she was being suspended pending an investigation due to the violation of her final warning. Hall said the violation date was December 27, 2019. Hall then told

LMF to grab her purse and jacket and leave the premises and that the company will contact her with their decision. LMF stood up and walked back to her desk to grab her belongings. She noticed that Hall and Johnson were standing at the cubicle across from her watching to make sure she "clocked out" and left. LMF could not believe that they had written her up for her approved early dismissal on December 27. LMF felt that it was especially odd because no one mentioned any issue with her leaving early that day for over two weeks. The only thing she could think of that would make HR and Shirk bring up her early dismissal now was that she had been applying to jobs in other departments at Shaw's or that she recently filed an EEOC charge against Shaw's on December 13, 2019. Upon information and belief, Shaws' received notice of the charge in the first week of January 2020.

85.     On January 16, 2020, LMF sent an email to Ward, Johnson, Harmon, Hall, and Shirk from home explaining that on December 27, 2019, she asked for Shirk's approval to leave work early, and he said "yes" and told her not to worry about getting in trouble or being terminated. LMF also explained that he had asked her to stay until noon.

86.     Later on January 16, 2020, Ward and Johnson called LMF and asked her to explain the email she had sent earlier that day. LMF told them that she had asked permission to leave early, that Shirk approved it and told her "not to worry about it," and that she would not be in trouble. Ward asked if LMF specifically asked Shirk whether she would be fired because she had been on final review. LMF told them, "yes, that is why I asked if he could excuse and approve me leaving sick as I was not feeling well." Ward told LMF that she would make a note of it, and they would contact her by the middle of the following week with the decision.

87.     On January 24, 2020, LMF had still not heard back from HR regarding her return to work status. LMF called Ward and asked for an update, and Ward told LMF "it was in writing" and that LMF "should get it in the mail that day or the following day," and she hung up.

88.     On January 25, 2020, nearly one month before her second FMLA leave was to commence, LMF received a termination letter in the mail stating that her termination was effective on January 23, 2020, as well as a pamphlet on how to apply for unemployment.

## COUNT I
## SEXUAL HARASSMENT -- HOSTILE WORK ENVIRONMENT
## BASED ON GENDER (FEMALE)
## Violation of M.G.L. c. 151B, § 4(1)
## (*Against All Defendants*)

89.     LMF repeats, reiterates, and realleges the above paragraphs as if they are set forth fully herein.

90.     LMF is a member of a protected class – female.

91.     Since the beginning of her employment, LMF was subjected to mistreatment including, amongst many other actions, relentless sexist commentary, sexual harassment, as well as a pervasively hostile work environment. This offending conduct was unwelcome, is both objectively and subjectively offensive and was so severe and pervasive that it not only interfered with every aspect of LMF's job, but it actually permeated into every aspect of the work environment. This offending mistreatment caused her pre-existing disability to worsen, causing her to have to adjust her medications which resulted in her having frequent "episodes" and missing work.

92.     LMF frequently reported this mistreatment to both HR and supervisors. No matter how many times LMF reported the sexual harassment to HR, the harassment continued and caused LMF's anxiety and depression to worsen.

93.     The actions and/or omissions of Defendants toward LMF were extreme and outrageous, driven by the evil motive of Defendants and their reckless indifference to LMF's rights. Based on the egregiousness of Defendants' actions, LMF is entitled to an award of punitive damages.

94.     As a result of the foregoing, LMF has in the past, and will in the future, suffer harm and damages, including, but not limited to loss of wages and other benefits, loss of professional opportunities and development, harm to her reputation, considerable emotional distress, humiliation, stress and anxiety, pain and suffering, other pecuniary and nonpecuniary losses, punitive damages, attorneys' fees, and costs.

## COUNT II
## SEXUAL HARASSMENT HOSTILE WORK ENVIRONMENT
## BASED ON GENDER (FEMALE)
## Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq.
### (*Against Shaw's*)

95.     LMF repeats, reiterates, and realleges the above paragraphs as if they are set forth fully herein.

96.     LMF is a member of a protected class – female.

97.     Since the beginning of her employment, LMF was subjected to mistreatment including, amongst many other actions, relentless sexist commentary, sexual harassment, as well as a pervasively hostile work environment. This offending conduct was unwelcome, is both objectively and subjectively offensive and was so severe and pervasive that it not only interfered with every aspect of LMF's job, but it actually permeated into every aspect of the work environment. This offending mistreatment caused her pre-existing disability to worsen, causing her to have to adjust her medications which resulted in her having frequent "episodes" and missing work.

98.     LMF frequently reported this mistreatment to both HR and supervisors. No matter
how many times LMF reported the sexual harassment to HR, the harassment continued and
caused LMF's anxiety and depression to worsen.

99.     The actions and/or omissions of Shaw's toward LMF were extreme and
outrageous, driven by the evil motive of Shaw's and their reckless indifference to LMF's rights.
Based on the egregiousness of Shaw's actions, LMF is entitled to an award of punitive damages.

100.    As a result of the foregoing, LMF has in the past, and will in the future, suffer
harm and damages, including, but not limited to loss of wages and other benefits, loss of
professional opportunities and development, harm to her reputation, considerable emotional
distress, humiliation, stress and anxiety, pain and suffering, other pecuniary and nonpecuniary
losses, punitive damages, attorneys' fees, and costs.

**COUNT III**
**DISPARATE TREATMENT BASED ON GENDER (FEMALE)**
**Violation of M.G.L. c. 151B, § 4(1)**
(*Against All Defendants*)

101.    LMF repeats, reiterates, and realleges the above paragraphs as if they are set forth
fully herein.

102.    LMF is a member of a protected class – female. At all times relevant, LMF
performed satisfactorily.

103.    At all times relevant, Defendants treated LMF differently than the male Shaw's
employees and Capstone employees working at Shaw's.

104.    This discriminatory treatment perpetrated by the male Shaw's employees and
Capstone employees working at Shaw's, and condoned and abetted by Defendants, as outlined in
detail above and incorporated by reference herein, was directed towards Plaintiff. This treatment

included, amongst many other actions, relentless sexual commentary, sexual harassment, advances, as well as a pervasively hostile work environment.

105.    LMF repeatedly reported this ongoing discriminatory treatment to both HR and supervisors, and Defendants failed to take prompt remedial action.

106.    Additionally, instead of taking any action against offending individuals, Defendants instead told LMF it was a "friendly environment" and that she needed to be "professional." Further, when LMF's mental health began deteriorating, Defendants allowed the mistreatment to continue, wrote her up for related absences, and slowly reduced her tasks and responsibilities. Thus, instead of disciplining the male bad actors, Defendants took adverse action against LMF.

107.    Defendants purposefully used LMF's protected status (female) in making employment decisions by allowing the male bad actor's sexual harassment of her to continue unabated and taking adverse action only on her and not the male bad actors.

108.    Finally, Defendants engaged in the ultimate adverse action by terminating LMF's employment.

109.    Upon information and belief, Defendants filled LMF's position with an individual with similar qualifications or the position otherwise remained open.

110.    The actions and/or omissions of Defendants toward LMF were extreme and outrageous, driven by the evil motive of Defendants and their reckless indifference to LMF's rights. Based on the egregiousness of Defendants' actions, LMF is entitled to an award of punitive damages.

111.    As a result of the foregoing, LMF has in the past, and will in the future, suffer harm and damages, including, but not limited to loss of wages and other benefits, loss of

professional opportunities and development, harm to her reputation, considerable emotional

distress, humiliation, stress and anxiety, pain and suffering, other pecuniary and nonpecuniary

losses, punitive damages, attorneys' fees, and costs.

## COUNT IV
### DISPARATE TREATMENT BASED ON GENDER (FEMALE)
### Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*
### (*Against Shaw's*)

112.    LMF repeats, reiterates, and realleges the above paragraphs as if they are set forth

fully herein.

113.    LMF is a member of a protected class – female. At all times relevant, LMF

performed satisfactorily.

114.    At all times relevant, Shaw's treated LMF differently than the male Shaw's

employees and Capstone employees working at Shaw's.

115.    This discriminatory treatment perpetrated by the male Shaw's employees and

Capstone employees working at Shaw's, and condoned and abetted by Shaw's, as outlined in

detail above and incorporated by reference herein, was directed towards Plaintiff. This treatment

included, amongst many other actions, relentless sexual commentary, sexual harassment,

advances, as well as a pervasively hostile work environment.

116.    LMF repeatedly reported this ongoing discriminatory treatment to both HR and

supervisors, and Shaw's failed to take prompt remedial action.

117.    Additionally, instead of taking any action against offending individuals, Shaw's

instead told LMF it was a "friendly environment" and that she needed to be "professional."

Further, when LMF's mental health began deteriorating, Shaw's allowed the mistreatment to

continue, wrote her up for related absences, and slowly reduced her tasks and responsibilities.

Thus, instead of disciplining the male bad actors, Shaw's took adverse action against LMF.

118.     Shaw's intentionally treated LMF differently than the similarly situated males by allowing the male bad actor's sexual harassment of her to continue unabated and taking adverse action against her and not the male bad actors.

119.     Finally, Shaw's engaged in the ultimate adverse action by terminating LMF's employment.

120.     Upon information and belief, Shaw's filled LMF's position with an individual with similar qualifications or the position otherwise remained open.

121.     The actions and/or omissions of Shaw's toward LMF were extreme and outrageous, driven by the evil motive of Shaw's and their reckless indifference to LMF's rights. Based on the egregiousness of Shaw's actions, LMF is entitled to an award of punitive damages.

122.     As a result of the foregoing, LMF has in the past, and will in the future, suffer harm and damages, including, but not limited to loss of wages and other benefits, loss of professional opportunities and development, harm to her reputation, considerable emotional distress, humiliation, stress and anxiety, pain and suffering, other pecuniary and nonpecuniary losses, punitive damages, attorneys' fees, and costs.

## COUNT V
## DISPARATE TREATMENT BASED ON DISABILITY
### Violation of M.G.L. c. 151B, § 4(16)
#### (*Against All Defendants*)

123.     LMF repeats, reiterates, and realleges the above paragraphs as if they are set forth fully herein.

124.     LMF is a qualified individual with a disability. LMF could perform the essential functions of her job with a reasonable accommodation.

125.     LMF disclosed her disability to Defendants on multiple occasions and was generally very open with Defendants regarding her disability, including, taking her medication in the open at her desk.

126.     Shaw's (through the third-party administrator, Albertsons' Companies) approved LMF for intermittent FMLA leave to treat her disability.

127.     At all times relevant, Defendants treated LMF differently than non-disabled employees.

128.     LMF repeatedly reported this ongoing discriminatory treatment to both HR and supervisors, and Defendants failed to take prompt remedial action.

129.     Defendants took adverse action against LMF because of her disability. LMF consistently complained to HR regarding the sexual harassment that was triggering her exacerbating her disability. Instead of taking any action against offending individuals, HR instead told LMF it was a "friendly environment" and that she needed to be "professional." Further, when LMF's mental health began deteriorating, and while she was on approved intermittent FMLA and STD leave Defendants allowed the mistreatment to continue, wrote her up for related absences, and slowly reduced her tasks and responsibilities. For instance, Defendants wrote LMF up for disability-related absences, and while she was on intermittent FMLA and STD leave (and Non-Occupational Medical leave), Defendants slowly reduced LMF's workload, tasks, and responsibilities and assigned them to nondisabled employees.

130.     Finally, Defendants engaged in the ultimate adverse action by terminating LMF's employment weeks before she would have been eligible to continue on FMLA leave and while she was on Non-Occupational Medical leave.

131.     Upon information and belief, Defendants filled LMF's position with an individual with similar qualifications or the position otherwise remained open.

132.     The conduct engaged in by Defendants, as outlined above, was extreme and outrageous, wanton, malicious, oppressive, and in gross and/or reckless indifference to the rights of LMF. Based on the egregiousness of Defendants' actions and/or omissions, LMF is entitled to an award of punitive damages.

133.     As a result of the foregoing, LMF has in the past, and will in the future, suffer harm and damages, including, but not limited to loss of wages and other benefits, loss of professional opportunities and development, harm to her reputation, considerable emotional distress, humiliation, stress and anxiety, pain and suffering, other pecuniary and nonpecuniary losses, punitive damages, attorneys' fees, and costs.

<u>**COUNT VI**</u>
<u>**DISPARATE TREATMENT BASED ON DISABILITY**</u>
<u>**Violation of the Americans with Disabilities Act,**</u>
<u>**42 U.S.C. §§ 12181 *et seq.***</u>
(***Against Shaw's***)

134.     LMF repeats, reiterates, and realleges the above paragraphs as if they are set forth fully herein.

135.     LMF is a qualified individual with a disability. LMF could perform the essential functions of her job with a reasonable accommodation.

136.     LMF disclosed her disability to Shaw's on multiple occasions and was generally very open with Shaw's regarding her disability, including, taking her medication in the open at her desk.

137.     Shaw's (through the third-party administrator, Albertsons' Companies) approved LMF for intermittent FMLA leave to treat her disability.

138.    At all times relevant, Shaw's treated LMF differently than non-disabled employees.

139.    LMF repeatedly reported this ongoing discriminatory treatment to both HR and supervisors, and Shaw's failed to take prompt remedial action.

140.    Shaw's took adverse action against LMF because of her disability. LMF consistently complained to HR regarding the sexual harassment that was triggering her exacerbating her disability. Instead of taking any action against offending individuals, HR instead told LMF it was a "friendly environment" and that she needed to be "professional." Further, when LMF's mental health began deteriorating, and while she was on approved intermittent FMLA and STD leave Shaw's allowed the mistreatment to continue, wrote her up for related absences, and slowly reduced her tasks and responsibilities. For instance, Shaw's wrote LMF up for disability-related absences, and while she was on intermittent FMLA and STD leave (and Non-Occupational Medical leave), Shaw's slowly reduced LMF's workload, tasks, and responsibilities and assigned them to nondisabled employees.

141.    Finally, Shaw's engaged in the ultimate adverse action by terminating LMF's employment weeks before she would have been eligible to continue on FMLA leave and while she was on Non-Occupational Medical leave.

142.    Upon information and belief, Shaw's filled LMF's position with an individual with similar qualifications or the position otherwise remained open.

143.    The conduct engaged in by Shaw's, as outlined above, was extreme and outrageous, wanton, malicious, oppressive, and in gross and/or reckless indifference to the rights of LMF. Based on the egregiousness of Shaw's actions and/or omissions, LMF is entitled to an award of punitive damages.

144.     As a result of the foregoing, LMF has in the past, and will in the future, suffer harm and damages, including, but not limited to loss of wages and other benefits, loss of professional opportunities and development, harm to her reputation, considerable emotional distress, humiliation, stress and anxiety, pain and suffering, other pecuniary and nonpecuniary losses, punitive damages, attorneys' fees, and costs.

**COUNT VII**
**DISABILITY DISCRIMINATION – FAILURE TO ACCOMMODATE**
**Violation of M.G.L. c. 151B, § 4(16)**
(*Against All Defendants*)

145.     LMF repeats, reiterates, and realleges the above paragraphs as if they are set forth fully herein.

146.     LMF is a qualified individual with a disability. LMF could perform the essential functions of her job with a reasonable accommodation.

147.     LMF notified Defendants of her disability and requested a reasonable accommodation of a "generally no more than one hour" per day break to take time alone away from her desk to deal with mild anxiety flare-ups and reactions to medication. LMF also requested leaves of absence of up to three days per episode with two episodes per month for moderate to severe symptoms. HR approved of LMF's one-hour per day accommodation to leave her desk but indicated if she left the building she would be required to clock out, would only be paid for one half-hour, and it would be considered her lunch break. Additionally, although HR approved her leaves of absence, Defendants wrote her up for disability-related attendance issues and reduced most of her tasks and responsibilities.

148.     On July 24 and 26, 2019, LMF's doctor submitted a request for a workplace accommodation (described in detail above and incorporated hereto), and HR never engaged in a good faith interactive process to consider these workplace accommodation requests. On August

5, 2019, Ward told LMF that she could not return to work and would have to be put on disability

leave unless she had "no restrictions or any time of medical leave" because of her "chronic

condition" and that if she did not return to work, her position would be "primarily filled." As a

result, LMF told Ward that she only needed a one-hour accommodation (less than what her

psychiatrist recommended) as LMF was afraid she would be terminated if she kept asking for the

recommended accommodation. HR effectively denied LMF's accommodation request for her

moderate to severe flare-ups without engaging in any meaningful interactive process.

149.    The conduct engaged in by Defendants, as outlined was extreme and outrageous,

wanton, malicious, oppressive, and in gross and/or reckless indifference to the rights of LMF.

Based on the egregiousness of Defendants' actions and/or omissions, LMF is entitled to an

award of punitive damages.

150.    As a result of the foregoing, LMF has in the past, and will in the future, suffer

harm and damages, including, but not limited to loss of wages and other benefits, loss of

professional opportunities and development, harm to her reputation, considerable emotional

distress, humiliation, stress and anxiety, pain and suffering, other pecuniary and nonpecuniary

losses, punitive damages, attorneys' fees, and costs.

**COUNT VIII**
**DISABILITY DISCRIMINATION – FAILURE TO ACCOMMODATE**
**Violation of the Americans with Disabilities Act,**
**42 U.S.C. §§ 12181 *et seq.***
(***Against Shaw's***)

151.    LMF repeats, reiterates, and realleges the above paragraphs as if they are set forth

fully herein.

152.    LMF is a qualified individual with a disability. LMF could perform the essential

functions of her job with a reasonable accommodation.

153.    LMF notified Shaw's of her disability and requested a reasonable accommodation of a "generally no more than one hour" per day break to take time alone away from her desk to deal with mild anxiety flare-ups and reactions to medication. LMF also requested leaves of absence of up to three days per episode with two episodes per month for moderate to severe symptoms. HR approved of LMF's one-hour per day accommodation to leave her desk but indicated if she left the building she would be required to clock out, would only be paid for one half-hour, and it would be considered her lunch break. Additionally, although HR approved her leaves of absence, Shaw's wrote her up for disability-related attendance issues and reduced most of her tasks and responsibilities.

154.    On July 24 and 26, 2019, LMF's doctor submitted a request for a workplace accommodation (described in detail above and incorporated hereto), and HR never engaged in a good faith interactive process to consider these workplace accommodation requests. On August 5, 2019, Ward told LMF that she could not return to work and would have to be put on disability leave unless she had "no restrictions or any time of medical leave" because of her "chronic condition" and that if she did not return to work, her position would be "primarily filled." As a result, LMF told Ward that she only needed a one-hour accommodation (less than what her psychiatrist recommended) as LMF was afraid she would be terminated if she kept asking for the recommended accommodation. HR effectively denied LMF's accommodation request for her moderate to severe flare-ups without engaging in any meaningful interactive process.

155.    The conduct engaged in by Shaw's, as outlined was extreme and outrageous, wanton, malicious, oppressive, and in gross and/or reckless indifference to the rights of LMF. Based on the egregiousness of Shaw's actions and/or omissions, LMF is entitled to an award of punitive damages.

156.     As a result of the foregoing, LMF has in the past, and will in the future, suffer harm and damages, including, but not limited to loss of wages and other benefits, loss of professional opportunities and development, harm to her reputation, considerable emotional distress, humiliation, stress and anxiety, pain and suffering, other pecuniary and nonpecuniary losses, punitive damages, attorneys' fees, and costs.

**COUNT IX**
**FMLA INTERFERENCE AND RETALIATION**
**Violation of 29 U.S.C. § 2601 et seq. and 29 C.F.R. § 825.220(c)**
(*Against All Defendants*)

157.     LMF repeats, reiterates, and realleges the above paragraphs as if they are set forth fully herein.

158.     Shaw's is a covered employer under the FMLA and LMF was both eligible and entitled to take FMLA leave.

159.     Ward, Johnson, Shirk, and Hall worked directly in the interest of Shaw's and are responsible for making decisions that contributed to Shaw's interference with LMF's rights under FMLA.

160.     LMF notified Defendants of her intention to take FMLA leave.

161.     Shaw's through its third-party administrator (Albertsons' Companies), approved LMF's FMLA leave request covering the period February 28, 2019 until February 28, 2020, and approved another intermittent FMLA leave covering the period February 29, 2020 until February 29, 2021.

162.     LMF's psychiatrist recommended that she take intermittent FMLA leave because she had been experiencing so much stress, anxiety and depression from the continued sexual harassment and to cope with the anxiety flare-ups she experienced while her medication was being adjusted.

163.    While on intermittent FMLA leave, Defendants slowly retaliated against LMF by reducing her workload, taking her tasks and work responsibilities away from her, and giving them to nondisabled employees.

164.    Defendants also required LMF to provide numerous additional doctor's notes and related health information during her intermittent FMLA leave period which constituted improper recertification in violation of FMLA regulations.

165.    Defendants also allowed the sexual harassment to continue unabated which worsened her condition requiring her to continue taking FMLA leave.

166.    Defendants also wrote LMF up for disability-related absences and took away her job responsibilities as described in detail above and incorporated herein.

167.    Defendants terminated LMF's employment effective January 23, 2020, shortly before she would be eligible to take her renewed FMLA leave. In fact, her FMLA leave had already been approved starting February 29, 2020.

168.    Defendants' actions violated FMLA, 29 U.S.C. § 2601, *et seq*.

**COUNT X**
**RETALIATION**
**Violation of M.G.L. c. 151B, §§ 4(4) and 4(16)**
**(*Against All Defendants*)**

169.    LMF repeats, reiterates, and realleges the above paragraphs as if they are set forth fully herein.

170.    Defendants took adverse action against LMF for complaining internally many times to HR and supervisors, and once to the employee hotline, in the form of continued and increased intensity of sexual harassment by the male warehouse employees, being written up for her disability-related absences and other attendance issues, and for taking FMLA leave, as well as Defendants' failure to properly investigate her claims, or even investigate her claims at all.

Thus, instead of disciplining the bad actors and implementing effective remedial measures, Defendants took adverse action against LMF.

171.    Defendants also took adverse action against LMF by allowing the mistreatment to continue unabated.

172.    LMF filed an EEOC charge on December 13, 2019.

173.    Upon information and belief, Defendants' received notice of her EEOC charge in the first week of January 2020.

174.    Finally, Defendants engaged in the ultimate adverse action by terminating LMF's employment.

175.    The conduct engaged in by the Defendants, as outlined above, was extreme and outrageous, wanton, malicious, oppressive, and in gross and/or reckless indifference to the rights of LMF. Based on the egregiousness of Defendants' actions and/or omissions, LMF is entitled to an award of punitive damages.

176.    As a result of the foregoing, LMF has in the past, and will in the future, suffer harm and damages, including, but not limited to loss of wages and other benefits, loss of professional opportunities and development, harm to her reputation, considerable emotional distress, humiliation, stress and anxiety, pain and suffering, other pecuniary and nonpecuniary losses, punitive damages, attorneys' fees, and costs.

**COUNT XI**
**RETALIATION**
**Violation of 42 U.S.C. § 2000e 3(a)**
(***Against Shaw's***)

177.    LMF repeats, reiterates, and realleges the above paragraphs as if they are set forth fully herein.

178.    Shaw's took adverse action against LMF for complaining internally many times to HR and supervisors, and once to the employee hotline, in the form of continued and increased intensity of sexual harassment by the male warehouse employees, being written up for her disability-related absences and other attendance issues, and for taking FMLA leave, as well as Shaw's failure to properly investigate her claims, or even investigate her claims at all. Thus, instead of disciplining the bad actors and implementing effective remedial measures, Shaw's took adverse action against LMF.

179.    Shaw's also took adverse action against LMF by allowing the mistreatment to continue unabated.

180.    LMF filed an EEOC charge on December 13, 2019.

181.    Upon information and belief, Shaw's received notice of her EEOC charge in the first week of January 2020.

182.    Finally, Shaw's engaged in the ultimate adverse action by terminating LMF's employment.

183.    The conduct engaged in by the Shaw's, as outlined above, was extreme and outrageous, wanton, malicious, oppressive, and in gross and/or reckless indifference to the rights of LMF. Based on the egregiousness of Shaw's actions and/or omissions, LMF is entitled to an award of punitive damages.

184.    As a result of the foregoing, LMF has in the past, and will in the future, suffer harm and damages, including, but not limited to loss of wages and other benefits, loss of professional opportunities and development, harm to her reputation, considerable emotional distress, humiliation, stress and anxiety, pain and suffering, other pecuniary and nonpecuniary losses, punitive damages, attorneys' fees, and costs.

## **PRAYER FOR RELIEF**

**WHEREFORE**, LMF respectfully requests that the Court grant the following relief:

(a)   judgment on Counts I through XI;

(b)   lost wages (back and front pay), emotional distress damages, and other compensatory damages in an amount to be determined at trial;

(c)   liquidated damages under the FMLA;

(d)   punitive damages;

(c)   costs, reasonable attorneys' fees, and interest; and

(d)   such other relief as the Court deems just and proper.

## **JURY DEMAND**

LMF hereby demands a trial by jury on all claims raised in her Complaint that are so triable.

Respectfully submitted,

LISA MACKEY-FUENTES,

By her attorneys,

Mark M. Whitney (BBO # 637054)
Maureen T. DeSimone (BBO # 703358)
WHITNEY LAW GROUP, LLC
11 State Street
Marblehead, MA 01945
Phone: (781) 631-4400
E: mwhitney@whitneylawgroup.com
E: mdesimone@whitneylawgroup.com

Dated: January 23, 2022

| CIVIL TRACKING ORDER (STANDING ORDER 1- 88) AMENDED | DOCKET NUMBER 2277CV00064 | Trial Court of Massachusetts The Superior Court |
|---|---|---|

| CASE NAME: Lisa Mackey-Fuentes vs. Shaw's Supermarkets, Inc. et al | Thomas H. Driscoll, Jr., Clerk of Courts |
|---|---|

| TO: Mark M Whitney, Esq. Whitney Law Group, LLC 11 State St Marblehead, MA 01945 | COURT NAME & ADDRESS Essex County Superior Court - Newburyport 145 High Street Newburyport, MA 01950 |
|---|---|

### AMENDED TRACKING ORDER - F - Fast Track

You are hereby notified that this case is on the track referenced above as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

| STAGES OF LITIGATION | SERVED BY | FILED BY | HEARD BY |
|---|---|---|---|
| Service of process made and return filed with the Court | | 07/25/2022 | |
| Response to the complaint filed (also see MRCP 12) | | 05/24/2022 | |
| All motions under MRCP 12, 19, and 20 | 05/24/2022 | 06/23/2022 | 07/25/2022 |
| All motions under MRCP 15 | 05/24/2022 | 06/23/2022 | 07/25/2022 |
| All discovery requests **and depositions** served and non-expert depositions completed | 11/21/2022 | | |
| All motions under MRCP 56 | 12/20/2022 | 01/19/2023 | |
| Final pre-trial conference held and/or firm trial date set | | | 05/19/2023 |
| Case shall be resolved and judgment shall issue by | | | 01/24/2024 |

**The final pre-trial deadline is <u>not the scheduled date of the conference</u>.** You will be notified of that date at a later time.

**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**

This case is assigned to:

| DATE ISSUED 04/21/2022 | ASSISTANT CLERK Anne Mitchell | PHONE (978)462-4474 |
|---|---|---|

Date/Time Printed:04-21-2022 09:59:35

SCV114: 03/2021

**RECEIVED**

4/20/2022

3

## COMMONWEALTH OF MASSACHUSETTS

ESSEX, ss.

SUPERIOR COURT

| |
|---|
| LISA MACKEY-FUENTES, |
| Plaintiff, |
| |
| v. |
| |
| SHAW'S SUPERMARKETS, INC, RAYE WARD, JENNIFER JOHNSON, KIRBY SHIRK, and JAMES HALL, |
| |
| Defendants. |

CIVIL ACTION NO. 2277-CV-00064 B

## MOTION TO ENLARGE SERVICE PERIOD BY NINETY (90) DAYS

NOW COMES the Plaintiff, Lisa Mackey-Fuentes ("Plaintiff"), by and through her attorneys, pursuant to M.R.C.P 6(b), and hereby respectfully requests that the Court issue an Order to enlarge the service period by ninety (90) days.  In support of this motion, Plaintiff states as follows:

1.    Plaintiff initiated this action by filing the Complaint on January 23, 2022.

2.    The ninety (90) day period to file returns of service upon all defendants expires on April 25, 2022.

3.    Plaintiff is aware that all of the named defendants in this action were represented by Littler Mendelson, P.C. ("Littler") in the agency (Massachusetts Commission Against Discrimination) matter, which preceded this action. On March 10, 2022, Plaintiff's counsel e-mailed prior counsel for all defendants, Shea Miller, to inquire if he would accept service of process on behalf of his clients. On March 11, 2022, Attorney Miller responded indicating that he was are contacting his client(s) and would be in touch shortly.

4/21/22

allowed.